UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                        :
                                                        :
JACK LEBEWOHL, JEREMY LEBEWOHL, UNCLE                   :
ABIES DELI INC. d/b/a SECOND AVE. DELI, UNCLE           :
ABIES DELI ON FIRST INC. d/b/a SECOND AVE.              :          11 Civ. 3153 (PAE)
DELI, and UNCLE ABIES DELI SANDWICH                     :
TRADEMARKS LLC,                                         :          OPINION & ORDER
                                                        :
                              Plaintiffs,               :
                                                        :
               -v-                                      :
                                                        :
HEART ATTACK GRILL LLC, HAG LLC, JON BASSO,             :
DIET CENTERS LLC (TEXAS), and DIET CENTER LLC           :
(DELAWARE),                                             :
                                                        :
                              Defendants.               :
                                                        :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

     The parties to this declaratory judgment action are restaurants that use provocative names

to market their extravagantly caloric food.  Defendants are a chain of theme restaurants called the

Heart Attack Grill and its owners (together, "HAG").  HAG's menu at its one extant restaurant

(in Las Vegas, Nevada) offers patrons the Single Bypass Burger, the Double Bypass Burger, the

Triple Bypass Burger, and the Quadruple Bypass Burger.  HAG has registered trademarks for the

restaurant name and the names of its four burgers.  Plaintiffs are a New York City kosher

delicatessen, the Second Avenue Deli, and its owners (together, "the Deli").  Since 2004, the

Deli has offered patrons the Instant Heart Attack Sandwich, and the Deli now proposes to add to

its menu an item called the Triple Bypass Sandwich.

     The issue before the Court is whether the Deli's current or contemplated uses of the

marks Instant Heart Attack Sandwich or Triple Bypass Sandwich violate HAG's rights under the

Lanham Act, 15 U.S.C. §§ 1052 *et seq.*  For the reasons that follow, the Court holds that the

Deli's current use of the Instant Heart Attack Sandwich mark does not violate HAG's rights; that the Deli may modestly expand its use of that mark, as set forth herein, without giving rise to a likelihood of confusion with HAG's mark; and that the Deli may also lawfully use the Triple Bypass Sandwich mark on a limited basis pursuant to a concurrent use arrangement to which the parties assented at oral argument.

## I.     Factual Background[1]

### A.     The Parties

The Deli is a kosher delicatessen with two locations in Manhattan.  It is owned by members of the Lebewohl family, descendants of the restaurant's founder, Abe Lebewohl, who established the Deli in 1954.  The plaintiffs are Jack Lebewohl, Jeremy Lebewohl, Uncle Abies Deli Inc. d/b/a Second Ave. Deli, Uncle Abies Deli on First Inc., and Uncle Abies Deli Sandwiches Trademarks LLC.  Compl. ¶¶ 22–23.

HAG is a chain of "medically themed" restaurants which first opened in late 2005.  HAG Answer ¶ 26.  There have been three such restaurants—in Chandler, Arizona; Dallas, Texas; and Las Vegas, Nevada—but only the last remains open.  Defendants Heart Attack Grill LLC and HAG LLC are Arizona limited liability companies that ran the Arizona restaurant.  *Id.* ¶¶ 6–7. Defendant Diet Center LLC (Texas) is a Texas limited liability company that ran the Dallas restaurant.  *Id.* ¶ 9.  Defendant Diet Center LLC (Delaware) is a Delaware limited liability

---

[1] The following facts are drawn from a variety of sources, including: the Second Amended Complaint ("Compl.") (Dkt. 25); HAG's Answer to the Second Amended Complaint ("HAG Answer") (Dkt. 27); HAG's Motion for Summary Judgment ("HAG Mot.") (Dkt. 53); the Deli's Motion for Summary Judgment ("Deli Mot.") (Dkt. 63); HAG's Opposition to the Deli's Motion for Summary Judgment ("HAG Opp'n") (Dkt. 74); the Deli's Opposition to HAG's Motion for Summary Judgment ("Deli Opp'n") (Dkt. 66); HAG's Reply Brief ("HAG Reply") (Dkt. 72); the Deli's Reply Brief ("Deli Reply") (Dkt. 76); Jack Lebewohl's Declaration ("Lebewohl Decl.") (Dkt. 76); and Jon Basso's Declaration ("Basso Decl.") (Dkt. 58 Ex. 1).

company that operates the Las Vegas restaurant.  HAG Answer ¶ 10.  Defendant Jon Basso is the manager-owner of each corporate defendant.  HAG Mot. 3.

In a Heart Attack Grill restaurant, provocatively dressed waitresses (called "nurses") take orders (called "prescriptions") from customers (called "patients").  HAG Answer ¶ 26.  The "patients" are given hospital wristbands which reflect which food they ordered.  *Id.*  HAG serves massive, highly caloric hamburgers, fries cooked in lard, and milkshakes.  *Id.* ¶ 27.  The menu tracks the theme of the restaurant—it includes the four burgers named above, all-you-can-eat "Flatliner Fries," and "ButterFat Shakes."  The largest of these burgers is the Quadruple Bypass Burger, which, at 8,000 calories, consists of four half-pound beef patties, eight slices of American cheese, a whole tomato and half an onion served in a bun coated with lard.  Customers weighing in at more than 350 pounds are entitled to eat for free.  (Dkt. 57 Ex. 10, at 16.)  As of this writing, one HAG patron has suffered a heart attack while dining at the Las Vegas restaurant.  Basso Decl. ¶ 4.

On June 9, 2005, HAG filed to register its Heart Attack Grill mark with the United States Patent and Trademark Office ("USPTO").  HAG has also registered marks in the names of its four burgers with the USPTO.  The Double Bypass Burger registration was filed on June 9, 2005.  The Single, Triple, and Quadruple Bypass Burger registrations were filed on December 27, 2005.

### B.    The Instant Heart Attack Sandwich

The Deli's Instant Heart Attack Sandwich is made from two large potato pancakes (latkes) and filled with the customer's choice of corned beef, pastrami, turkey, or salami.  Lebewohl Decl. ¶ 6.  Jack Lebewohl attests that he conceived of the idea for this sandwich

around 2004, after a conversation with a well-known chef and a New York City Police

Department detective.  *Id.*

  The Deli does not have any business records that indicate precisely the date when it

began serving the Instant Heart Attack Sandwich.  Materials adduced at summary judgment,

however, indicate that the sandwich was offered starting in 2004, at some point before HAG, in

June 2005, applied to register the term Heart Attack Grill.  The sandwich was listed on a Deli

menu dated "2004-05," in connection with a Deli location that closed on January 1, 2006.  *Id.* ¶

8.  And, Internet message board posts and articles produced by the Deli reference the Instant

Heart Attack Sandwich mark before June 2005, including the following:

- A May 19, 2004 review of the Deli, which appeared on Chowhound.com, an Internet food discussion board, mentions the Instant Heart Attack Sandwich.  It describes the sandwich as "flavorful and good."  (Dkt. 57 Ex. 12.)

- A January 13, 2005 review of the Deli on a Chowhound message board post similarly recommended the Deli and the Instant Heart Attack sandwich, by name.  (Dkt. 65 Ex. 4.)

- A July 2004 Korean Airlines newsletter mentions the Instant Heart Attack Sandwich.  (Dkt. 65 Ex. 3.)

  On September 29, 2010, the Deli filed a trademark application with the USPTO to

register the Instant Heart Attack Sandwich mark.  Deli Mot. 4.

  On January 13, 2011, the USPTO preliminarily denied the application in a non-final

"Office Action."  The USPTO based that denial on a likelihood of consumer confusion it found

between that mark and HAG's Heart Attack Grill mark.  (Dkt. 57, Ex. 13.)  Citing 15 U.S.C. §

1052(d) of the Lanham Act, the USPTO stated that, "[g]iven the similarity of the marks and the

goods and/or services, prospective customers are likely to confuse the source of the respective

goods and/or services."  *Id.*

  **C.**  **The Triple Bypass Sandwich**

To date, the Deli has not offered the Triple Bypass Sandwich.  As conceived by the Deli, the Triple Bypass Sandwich, like the Instant Heart Attack Sandwich, would use potato pancakes in lieu of bread or buns; however, the sandwich would include three, not two, layers of pancakes. On September 29, 2010, the same day that it filed its application for the Instant Heart Attack Sandwich mark, the Deli filed an intent-to-use application for the Triple Bypass Sandwich mark. Deli Mot. 4.  The Deli represents that, at that time, it was unaware of HAG's Triple Bypass Burger.  Lebewohl Decl. ¶¶ 9, 11.

In its January 13, 2011, non-final Office Action, the USPTO found that the Triple Bypass Sandwich mark was sufficiently similar to HAG's Triple Bypass Burger mark—and to HAG's other "bypass" marks—to merit denial of the Deli's application.  The USPTO concluded that registering the Triple Bypass Sandwich mark would create a likelihood of confusion.  (Dkt. 65 Ex. F.)

> **D.      Procedural History of this Litigation**

On March 29, 2011, HAG sent a cease-and-desist letter to the Deli.  HAG demanded that the Deli refrain from using the terms Instant Heart Attack Sandwich and Triple Bypass Sandwich, on the grounds that each created a likelihood of confusion with HAG's registered marks.  HAG Mot. 9.

On May 10, 2011, the Deli filed this declaratory judgment action.  The Deli sought a ruling that neither of its two pending marks infringe any of HAG's marks and that the Deli may therefore register those marks.  Alternatively, the Deli sought a ruling that, if the Court were to find a likelihood of confusion between its marks and HAG's, it may use the Instant Heart Attack Sandwich mark (as to which its usage is senior to HAG's registration of the Heart Attack Grill mark) in New York, New Jersey, and Connecticut, to the exclusion of HAG's mark.  The Deli

also asked that proceedings before the USPTO in connection with its two proposed marks be suspended pending the outcome of this case.  (Dkt. 65 Ex. F.)

HAG filed four counterclaims.  The first was a dilution claim under the Federal Trademark Dilution Act, alleging that the Deli's use of its proposed marks would dilute the "quality and character" of HAG's  marks.  (Dkt. 6, pp. 11–14.)  On January 5, 2012, the Court dismissed this claim.  (Dkt. 41.)  HAG also sought declarations that (1) the Deli cannot register its marks; (2) the Deli may not expand its use of the marks; and, alternatively, (3) the parties may use their respective marks under conditions and limitations to be set by the Court.

The parties have engaged in extensive discovery.  As to the Deli's claims, both sides have moved for summary judgment.  HAG alternatively seeks dismissal, on the grounds that the Deli is not using its marks in interstate commerce, and thus lacks standing to seek relief under the Lanham Act.  Both sides also seek legal fees.  HAG has also, for the second time, voluntarily moved to dismiss its counterclaims without prejudice.

Oral argument was held on May 22, 2012.  At argument, both parties helpfully narrowed the areas in dispute as to both of the Deli's sandwich offerings, facilitating the Court's resolution of this suit.  The Court particularly appreciated HAG's concessions that the use by the Deli of each of the two marks in question, subject to certain limitations, would not create a likelihood of confusion and is, therefore, permissible.  May 22, 2012 Tr. 21–22, 48.

## II.    Summary Judgment Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  The movant may also discharge its burden by demonstrating, where the adversary bears the burden of proof on a claim, that there is insufficient evidence to support the opposing party's claim.  *See Celotex*, 477 U.S. at 322–23.

    To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, "we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.   Discussion

    The Court first addresses the Deli's declaratory judgment claims related to the Instant Heart Attack Sandwich, followed by the claims related to the Triple Bypass Sandwich.

### A.     The Deli's Claims

#### 1.     The Instant Heart Attack Sandwich

    The Deli seeks a declaratory judgment that its current use of the Instant Heart Attack Sandwich mark does not infringe HAG's Heart Attack Grill mark.  The Deli also seeks a ruling

that it may expand its use of that mark, as contemplated in its application for registration of that mark with the USPTO.

In assessing these claims, the Court first examines whether it has jurisdiction to resolve this dispute.  Assuming jurisdiction, the Court next looks to whether there is a likelihood of confusion between the marks based on their current use.  The Court then considers whether the Deli's expanded use of the mark as contemplated in its application for Lanham Act registration may result in a likelihood of confusion, and the extent to which the present record permits the Court to find permissible concurrent use of the parties' marks.

### a.        Use of the Mark in Commerce

For the Court to exercise jurisdiction over this dispute, the Deli must be (1) using the Instant Heart Attack Sandwich as a mark, and (2) doing so "in commerce" within the meaning of the Lanham Act.  In considering this question, the Court considers first what type of mark is at issue. There are two primary types of marks that can be registered with the USPTO: a service mark and a trademark.  "Under the Lanham Act, the only difference between a trademark and a service mark is that a trademark identifies goods while a service mark identifies services." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1194 n.1 (9th Cir. 2009) (internal quotation marks and citation omitted).[2]

The parties agree that the Instant Heart Attack Sandwich—used on menus in the Deli's restaurants and on its website, Lebewohl Decl. ¶ 10—is being used as a trademark.  *See Famous*

---

[2] While a trademark identifies and distinguishes the source and quality of a tangible product, "a service mark functions to identify and distinguish the source and quality of an intangible service." *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1345 (E.D.N.Y. 1994) (quoting 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 19.29(1), at 19:134 (3d ed. 1992)).  "Service marks and trademarks are governed by identical standards . . . ." *Lahoti*, 586 F.3d at 1190 n.1 (internal quotations and citation omitted).

*Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 110 (2d Cir. 2010) (mark is used on goods when "it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale") (quoting 15 U.S.C. § 1127); HAG Opp'n 10 ("HAG agrees that use on a menu can be trademark use.").  Although the parties are surely correct as to this point, in the Court's view, the Instant Heart Attack Sandwich also possesses dimensions of a service mark.  The sandwich is, at once, a product that can be readily identified as a discrete piece of merchandise and also a part of the services offered by the Deli, a service establishment, to patrons.  The Deli, a longstanding New York institution and tourist attraction, provides an experience shaped by both the service it offers and the iconic dishes and food items it serves.  The particular food items, including the Instant Heart Attack Sandwich, are, in this way, bound up with the experience that the Second Avenue Deli provides. The Court is also mindful that a restaurant's specialty sandwich, by its nature, is short-lived— within minutes of its creation, it is devoured, generally not having ever left the place where it came to be.  In that respect, it differs from a typical trademarked good that is carried from place to place.  It is therefore appropriate, in considering whether the Instant Heart Attack Sandwich mark is "used in commerce," to consider the standards used for assessing Lanham Act jurisdiction both as to trademarks and service marks.

"It is well established that Lanham Act jurisdiction extends to the limits of Congress's power to regulate interstate commerce.  [15 U.S.C. § 1127] defines 'commerce' to include 'all commerce which may lawfully be regulated by Congress.'"  *See Thompson Tank & Mfg. Co. v. Thompson*, 693 F.2d 991, 993 (9th Cir. 1982); *Arrow United Indus. v. Hugh Richards Inc.*, 678 F.2d 410, 413 n.5 (2d Cir. 1982).  The term "use in commerce" as used in the Lanham Act

"denotes Congress's authority under the Commerce Clause rather than an intent to limit the [Lanham] Act's application to profit making activity."  *United We Stand Am. Inc. v. United We Stand Am. N.Y. Inc.*, 128 F.3d 86, 92–93 (2d Cir. 1997) (citation omitted), *cert. denied*, 523 U.S. 1076 (1998); *see also* U.S. Const., art. I, § 8, cl. 3.

Consistent with this, the Supreme Court has long broadly construed the Lanham Act's reach, *see Steele v. Bulova Watch Co.*, 344 U.S. 280, 283 (1952), and courts have treated the "in commerce" requirement as not imposing a stringent limitation.  *See Patsy's Italian Rest. Inc. v. Banas*, 658 F.3d 254, 268 (2d Cir. 2011); *Lobo Enter. Inc. v. The Tunnel Inc.*, 822 F.2d 331, 332–33 (2d Cir. 1987); *Demetriades v. Kaufmann*, 698 F. Supp. 521, 524 (S.D.N.Y. 1988) ("[T]he Second Circuit has held that a defendant's wholly intrastate activities will be subject to [15 U.S.C. 1125(a)'s] apparently long reach if those activities may be said to affect plaintiff's business and that business is interstate.") (emphasis omitted) (citing *Arrow United*, 678 F.2d at 413 n.5); *Laurel Capital Grp. Inc. v. BT Fin. Corp.*, 45 F. Supp. 2d 469, 477 (W.D. Pa. 1999) ("The courts . . . have repeatedly found jurisdiction where the defendant's use [of a mark] is solely intrastate, provided the plaintiff[']s business activities 'involve' or 'affect' interstate commerce."); *see also* 3 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 25:57 (4th ed. 1999) ("It is difficult to conceive of an act of infringement which is not 'in commerce' in the sense of the modern decisions.  Thus, it may not be inaccurate to predict that the 'use in commerce' requirement will not be much of an issue in future litigation, barring cases with unusual twists in the facts.").

As to trademarks, under 15 U.S.C. § 1127, a trademark is used in commerce when "the goods are sold or transported in commerce."  In *Bertolli USA Inc. v. Filippo Bertolli Fine Foods, Ltd.*, the "in commerce" requirement was met where the defendant, an olive oil producer, had

printed labels and cartons, sent one bottle to a potential distributor and offered to send another bottle to a different distributor.  662 F. Supp. 203, 205 (S.D.N.Y. 1987).  In *Li'l Red Barn Inc. v. Red Barn System Inc.*, the Seventh Circuit upheld a finding that merely placing a trademarked product on sale at an outlet that enjoys substantial business from out-of-state buyers satisfied the requirements of the Lanham Act.  322 F. Supp. 98 (N.D. Ind. 1970), *aff'd*, 174 U.S.P.Q. 193 (7th Cir. 1972); 3 McCarthy, *Trademarks and Unfair Competition*, § 19.123 (4th ed. 2012).

As to service marks, they are used in commerce when "the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services."  15 U.S.C. § 1127.  In *Larry Harmon Pictures Corp. v. Williams Rest. Corp.*, for example, the Federal Circuit affirmed a finding that a single restaurant had used its service mark in interstate commerce where (1) the restaurant was a 50 to 60 minute drive from Memphis, a "major commercial center for the Mid-South region"; (2) the restaurant had been mentioned in publications originating in various out-of-state cities; and (3) the parties agreed that the restaurant's services were rendered to at least "some interstate travelers."  929 F.2d 662, 663 (Fed. Cir. 1991).

Measured against these standards, the Instant Heart Attack Sandwich mark is fairly determined to be "used in commerce."  The Deli itself undisputedly is in, and affects, interstate commerce.  A celebrated New York City tourist attraction, the Deli serves many interstate travelers.  *See* Lebewohl Decl. ¶ 13; HAG Reply 14 (admitting that the Deli affects interstate commerce).  It is readily accessed by interstate thoroughfares; its two locations (in Midtown and on the Upper East Side) are readily accessed from, and accessible to, interstate highways (including I-495).  Both are easily reached from New Jersey, only a few miles away.  Lebewohl

11

Decl. ¶ 13.  Further evidence that the Deli's clientele extends beyond New York State is supplied by the national media coverage that the Deli has received, including from *The New York Times*, the *Wall Street Journal*, *Zagat's*, and CBS News.  Lebewohl Decl. ¶ 5.  There is every reason to assume that the Deli's in-state and out-of-state clientele alike partake of all of the Deli's menu offerings, including the Instant Heart Attack Sandwich.  *See Patsy's*, 658 F.3d at 268 (noting restaurant's proximity to interstate highways, and citations to the restaurant in media articles, as factors supporting finding that the restaurant's service mark was used in interstate commerce); *Larry Harmon*, 929 F.2d at 663; *cf.* 3 McCarthy, *Trademarks and Unfair Competition*, § 19.123 (4th ed. 2012) (interstate commerce requirements for trademark can be satisfied by placing a product for sale at an outlet that enjoys substantial out-of-state business).  Further, as noted, the Deli has listed the Instant Heart Attack Sandwich on menus available to its out-of-state customers, and the sandwich itself has been referenced in national media, including a Korean Airlines newsletter and twice in reviews on the Chowhound website.[3]

The Deli has also spent hundreds of thousands of dollars purchasing ingredients from out-of-state vendors.  These include "sausages, meats, wines and groceries."  Deli Mot. 10.  It is fair to infer that the Instant Heart Attack Sandwich, which is constructed from corned beef, pastrami, turkey, or salami, contains ingredients transported from outside New York State.  *See*

---

[3] *See Patsy's*, 658 F.3d at 268 (newspaper citations may be evidence of use in interstate commerce); *see also Demetriades*, 698 F. Supp. at 524 (noting that an advertisement in *The New York Times* contributed to finding use in commerce, because the publication "enjoys wide interstate circulation"); *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch. LLC*, 470 F. Supp. 2d 365, 371 (S.D.N.Y. 2007) ("[P]resale 'analogous use' of a mark, such as publicity 'in advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications' . . . may be adequate to establish prior use in commerce.") (quoting *Hous. & Servs., Inc. v. Minton*, No. 97-cv-2725, 1997 WL 349949, at *4 (S.D.N.Y. June 24, 1997)).  HAG has disputed the admissibility of the Korean Airlines newsletter and the Chowhound reviews.  The Court addresses that argument *infra*, at p. 22.

*Katzenbach v. McClung*, 379 U.S. 294, 300–01 (1964) (finding restaurant within Congress's reach where 46% of the food purchased by the restaurant came from a local supplier who had *separately* purchased it from an out-of-state supplier); *Dominic's Rest. of Dayton, Inc. v. Mantia*, No. 09-cv-131, 2009 WL 1045916, at *5 (S.D. Ohio Apr. 20, 2009); *S & C Rest. Corp. v. Sofia's Diner Rest. Inc.*, No. 98-cv-5972, 1999 WL 627914, at *4 (E.D. Pa. Aug. 18, 1999).

For these reasons, the Court concludes that the jurisdictional requirement of the Lanham Act is satisfied with respect to the Instant Heart Attack Sandwich mark.

### b.      Present Likelihood of Confusion

The Court turns next to the issue of whether there is a likelihood of confusion between the Deli's Instant Heart Attack Sandwich mark and HAG's Heart Attack Grill, based on the current usage of the Deli's mark.  In preliminarily denying the Deli's application, the USPTO found a likelihood of confusion.  However, following discovery, the parties have concluded, and each has represented, that there is no likelihood of confusion presented by the Deli's current use of the mark.  *See* Deli Reply 1 (Deli); Tr. 36 (HAG).  The Deli's current use consists of (1) listing the Instant Heart Attack Sandwich on the menus used in the Deli's two Manhattan restaurants, and (2) listing the sandwich on the Deli's website menu.  Lebwohl Decl. ¶ 10.  The sandwich has not been advertised or marketed, and does not appear on any signage.  *Id.*

In this Circuit, decisions of the USPTO are given a degree of deference.  *See Murphy Door Bed Co., Inc. v. Interior Sleep Sys. Inc.*, 874 F.2d 95, 101 (2d Cir. 1989); *M & G Elecs. Sales Corp. v. Sony Kabushiki Kaisha*, 250 F. Supp. 2d 91, 98 (E.D.N.Y. 2003).  But, "in the end, the Court is 'not bound' by such an initial determination, and is obligated to ultimately render its own decision on the merits."  *Real News Project Inc. v. Indep. World Television Inc.*, No. 06-cv-4322, 2008 WL 2229830, at *10 n.14 (S.D.N.Y. May 27, 2008) (citing *D.M. &*

*Antique Import Corp. v. Royal Saxe Corp.*, 311 F. Supp. 1261, 1274 (S.D.N.Y. 1970)).  The

deference due to the USPTO's decision here is limited because it was not a final decision of the

USPTO, *see Patsy's Italian Rest. Inc. v. Banas*, 508 F. Supp. 2d 194, 215 (E.D.N.Y. 2007), and

that preliminary decision was made without the benefit of the discovery taken in this case,

following which HAG has acknowledged that there is no present likelihood of confusion.

In assessing likelihood of confusion in this Circuit, the Court applies an eight-factor

balancing test first set out by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d

492 (2d Cir. 1961).  The "analysis is not mechanical, but rather, focuses on the ultimate question

of whether, looking at the products in their totality, consumers are likely to be confused."  *Star*

*Indus. Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005) (citing *Nora Beverages Inc.*

*v. Perrier Grp. of Am. Inc.*, 269 F.3d 114, 119 (2d Cir. 2001)).  The eight factors are:  (1)

strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their

competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by

developing a product for sale in the market of the alleged infringer's product; (5) evidence of

actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7)

respective quality of the products; and (8) sophistication of consumers in the relevant market.

Balancing the *Polaroid* factors, the Court finds that there is no likelihood of confusion

based on the Deli's current usage of its mark.  Most of the *Polaroid* factors point against likely

confusion, including, most centrally, that the Deli and HAG do not presently compete in the

same geographic market.  Two factors, however, do suggest that confusion could conceivably

exist if there ever were head-to-head competition: the strength of HAG's mark and the similarity

shared by the two marks.  The Court's analysis of the *Polaroid* factors is as follows:

*Strength of the Mark*

Whether a mark is entitled to protection depends on whether it is inherently distinctive or, if merely descriptive, has acquired "secondary meaning."[4]  *See Arrow Fastener Co. Inc. v. Stanley Works*, 59 F.3d 384, 393 (2d Cir. 1995).  Marks are classified as either:  (1) generic, (2) descriptive, (3) suggestive, or (4) fanciful or arbitrary.  *Star Indus. Inc.*, 412 F.3d at 384. "Generic marks are those consisting of words identifying the relevant category of goods or services.  They are not at all distinctive and thus are not protectable under any circumstances." *Id.* at 385 (citing *TCPIP Holding Co. v. Haar Commc'ns Inc.*, 244 F.3d 88, 93 (2d Cir. 2001)). Descriptive marks consist of words identifying qualities of the product; they are not inherently distinctive, but are protectable as long as they have acquired secondary meaning.[5]  *TCPIP*, 244 F.3d at 94.  Suggestive marks and arbitrary or fanciful marks are each inherently distinctive.  *Id.* Suggestive marks are not directly descriptive, but "do suggest a quality or qualities of the product through the use of 'imagination, thought and perception.'"  *Star Indus.*, 412 F.3d at 385 (quoting *Time Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 118 (2d Cir. 1999)).  Arbitrary or fanciful marks do not communicate "any information about the product either directly or by suggestion."  *Star Indus.*, 412 F.3d at 385 (citations omitted).  An arbitrary mark "has an actual

---

[4] A mark develops secondary meaning when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Inwood Labs. Inc. v. Ives Labs. Inc.*, 456 U.S. 844, 851 n.11 (1982).  *See also Arrow Fastener*, 59 F.3d at 390 ("Secondary meaning attaches when 'the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business. . . .'") (quoting *Pirone v. MacMillan Inc.*, 894 F.2d 579, 583 (2d Cir. 1990)).

[5] "Examples of descriptive marks are 'Custom-Blended' for gasoline or 'Gas-Badge' for a badge to monitor gaseous pollutants. A good example of a suggestive mark is 'Gleem' for toothpaste." *PaperCutter Inc. v. Fay's Drug Co. Inc.*, 900 F.2d 558, 563 (2d Cir. 1990) (quoting Stephen L. Carter, *The Trouble With Trademark*, 99 YALE L.J. 759, 771 (1990)).

dictionary meaning, but that meaning does not describe the product." *Arrow Fastener*, 59 F.3d at 391.  A fanciful mark is simply a made-up term.  *Id.*

The Heart Attack Grill mark is not generic, because the mark goes beyond a simple identification of a category of goods or services, or descriptive, because it fails to identify with any explicit clarity exactly what service will be offered.  Nor is it arbitrary or fanciful, in that it does communicate some information about the product.  HAG's Heart Attack Grill mark is properly classified as suggestive. The mark itself makes clear that its proprietor will offer food services of some kind, but does not explicitly state what type of food will be offered.  A person using "imagination, thought and perception," *Star Indus.*, 412 F.3d at 385, however, can easily infer that the food offered at the "grill" is unhealthful, and unusually so, because the dramatic phrase "heart attack" clearly connotes extremely unhealthful eating habits.  The Heart Attack Grill mark is thus suggestive and inherently distinctive.  It is entitled to some protection.

*Similarity of the Marks*

In assessing the similarity of two marks, courts look to the "overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers."  *See Gruner Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993).  This analysis demands more than just a side-by-side comparison of the terms.  If the appearance of the marks "is similar enough that it may confuse consumers who do not have both marks before them but who may have a 'general, vague, or even hazy, impression or recollection' of the other party's mark, there may still be similarity." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988) (citing *James Burrough Ltd. v. Sign of Beefeater Inc.*, 540 F.2d 266, 275 (7th Cir. 1976)).

Although the two phrases—Heart Attack Grill and Instant Heart Attack Sandwich—differ such that a consumer eyeing them side by side could certainly tell them apart, a consumer's "hazy[] impression or recollection" of the marks might result in confusion. *Id.* The words that leap out in both marks are clearly "heart attack." When the dominant words in two marks are the same, courts have found that their similarity can cause consumer confusion. *See Morningside Grp. Ltd. v. Morningside Capital Grp. LLC*, 182 F.3d 133, 140 (2d Cir. 1999) (comparing the two corporate names, "Morningside" is the only term that stands out); *see also Connecticut Cmty. Bank v. The Bank of Greenwich*, 578 F. Supp. 2d 405, 418 (D. Conn. 2008) ("The operative and identifying words of each mark are the only ones that catch the reader's eye, namely 'bank' and 'Greenwich.'"). This factor thus also favors a finding of potential confusion.

*Proximity of the Products*

This inquiry focuses on whether and to what extent the two products compete with each other. *See Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 582 (2d Cir. 1991). Courts examine "the nature of the products themselves and the structure of the relevant market," including the class of customers to whom the goods are sold, the manner in which they are advertised, and the channels through which they are sold. *Vitarroz v. Borden Inc.*, 644 F.2d 960, 967 (2d Cir. 1981).

Among the factors relevant to this analysis is the geographic proximity, or lack thereof, among the competing products. In *Brennan's Inc. v. Brennan's Restaurant LLC*, a New Orleans restaurant called Brennan's (which had one other outpost, in Memphis, Tennessee) sued a single restaurant in New York City called Terrence Brennan's Seafood & Chop House. 360 F.3d 125 (2d Cir. 2004). The Court held that geographic remoteness was

> critical in this case. In the restaurant industry, especially where individual restaurants rather than chains are competing, physical separation seems

> particularly significant to the inquiry into consumer confusion. Even in this age of rapid communication and travel, plaintiff faces a high hurdle to demonstrate that a single restaurant in New Orleans and a single restaurant in New York City compete for the same customers. That is particularly the case here where the dining services require a customer's physical presence and cannot rely, for instance, on Internet or mail-order sales.

*Id.* at 134.  The *Brennan's* Court's analysis is singularly apt here.  Indeed, at present, HAG and the Deli are located twice as far apart as the restaurants in that case.  The record lacks any suggestion of any overlap among the present customer bases of HAG and the Deli or any present competition of any kind.

Furthermore, there are other differences that separate the marks.  HAG and the Deli pitch for vastly different customers.  HAG proudly represents (even in its court papers) that its food is unhealthful.  It even draws attention to the fact of a customer who had a heart attack while on the premises.  Its food is served by scantily clad waitresses dressed like nurses, as part of its overall "medical"—perhaps better cast as "paramedic"—theme.  The Deli, by contrast, is a kosher deli which serves kosher food in the style of a traditional Manhattan deli.  Its offerings, other than the Instant Heart Attack Sandwich, do not trumpet their unhealthfulness; and its marketing does not remotely resemble that of HAG's.  Further, being a kosher deli, the Deli could not serve sandwiches containing both meat and cheese.  This factor thus strongly favors a finding of no confusion.

### Bridging the Gap

This factor considers the likelihood that HAG will enter the Deli's market in the future, or that consumers will perceive HAG as likely to do so.  *Star Industries*, 412 F.3d at 387.  The purpose of the gap-bridging analysis is "to protect the senior user's 'interest in being able to enter a related field at some future time.'"  *W.W.W. Pharm Co. v. Gillette Co.*, 984 F.2d 567, 574 (2d Cir. 1993) (*quoting Scarves by Vera Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir.

1976)).  A speculative intention is insufficient to demonstrate that bridging the gap is likely; a litigant should provide evidence of a concrete expansion plan.  *See 24 Hour Fitness USA Inc. v. 24/7 Tribeca Fitness LLC*, 447 F. Supp. 2d 266, 277 (S.D.N.Y. 2006), *aff'd*, 247 F. App'x 232 (2d Cir. 2007) (summ. order); *see also Horn's Inc. v. Sanofi Beaute Inc.*, 963 F. Supp. 318, 325 (S.D.N.Y. 1997) (finding no likelihood that plaintiff, a fashion industry consultant and magazine publisher, would market a perfume where there was no evidence of such plans on the record); *Lang*, 949 F.2d at 582 (plaintiff's claim that it had "considered" publishing self-help guides had not crystallized, was speculative, and did not demonstrate a likelihood of entering the defendant's market).

No evidence has been presented of any concrete intention by HAG to open a New York branch of its restaurant, or by the Deli to expand beyond New York City and its environs.  Thus, this factor favors a finding of no confusion.

*Actual Confusion*

Evidence of actual consumer confusion is strong evidence of a likelihood of confusion. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987).  "Even if the movant shows actual confusion by only a small percentage of buyers, he may sustain his case based on the inference that a few proven instances of actual confusion betoken a more substantial likelihood of confusion."  *Lon Tai Shing Co. Ltd. v. Koch + Lowy*, No. 90-cv-4464, 1991 WL 170734, at *11 (S.D.N.Y. June 20, 1991).  Although evidence of actual confusion is not required to prove a likelihood of confusion, "it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion."  *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1136 (2d Cir. 1979), *overruled on other grounds by Bristol-Myers Squibb Co. v. McNeil-P.P.C. Inc.*, 973 F.2d 1033, 1044 (2d Cir. 1992).

Here, neither party has presented a single instance of actual consumer confusion. This factor weighs in favor of a finding of no confusion at this time.

*Good Faith*

Under this factor, courts look to "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang*, 949 F.2d at 583 (quoting *Edison Bros. Stores v. Cosmair Inc.*, 651 F. Supp. 1547, 1560 (S.D.N.Y. 1987)). "Prior knowledge of a senior user's trade mark does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Arrow Fastener*, 59 F.3d at 397.

There are no allegations of bad faith here. On the contrary, Jack Lebewohl claims that he conceived of the Instant Heart Attack Sandwich "around 2004," Lebewohl Decl. ¶ 5, and, as noted, there is substantial evidence that the Deli began to use that mark before HAG registered its Heart Attack Grill mark. This factor thus weighs in favor of a finding of no confusion.

*Quality of the Products*

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener*, 59 F.3d at 398. Neither party complains about a loss to reputation based on the other party's mark. On the contrary, the Court, on HAG's motion, has voluntarily dismissed a counterclaim in which HAG had alleged dilution of its mark. (Dkt. 41.)

*Sophistication of the Buyers*

The eighth *Polaroid* factor, sophistication of the buyers, "recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." *Cadbury Beverages Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996) (citations

omitted).  Although the record does not permit the Court to assess the sophistication of the patrons of the Deli and HAG, it is safe to say that even an unsophisticated customer could readily differentiate between a Manhattan kosher deli and its latke-based sandwich and a Las Vegas "medically themed" restaurant that features gluttonous cheeseburgers.  Such a customer also presumably can differentiate between a restaurant bearing a "heart attack" name and a sandwich with a similar name.  This factor also favors a finding of no confusion.

> *Overall Assessment*

In balancing the *Polaroid* factors, "courts generally should not treat any single factor as dispositive; nor should a court treat the inquiry as a mechanical process by which the party with the greatest number of factors wins.  Instead, the court should focus on the ultimate question of whether consumers are likely to be confused."  *Natural Organics Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir. 2005) (citation omitted).  Here, balancing the *Polaroid* factors, the Court concludes that, based on the parties' present practices and the lack of any actual present competition between them, there is, clearly, no likelihood of confusion.  The Deli's request for a declaratory judgment of no infringement at this time as to the Instant Heart Attack Sandwich mark is, therefore, granted.

### c.  Potential for Future Confusion / Concurrent Use

The Deli seeks a declaration that expanded use of the Instant Heart Attack Sandwich mark would not create a likelihood of consumer confusion, or, alternatively, if there is such confusion, a declaration that concurrent use by the Deli and HAG of their respective "heart attack" marks is permissible.  Specifically, the Deli seeks a declaration that it is entitled to exclusive use of the Instant Heart Attack Sandwich mark in New York, New Jersey, and Connecticut.

In addressing the Deli's application, the Court considers at the threshold whether the Deli has established, through competent evidence, that it used the Instant Heart Attack Sandwich mark before the date when HAG filed to register its mark (June 9, 2005).  That showing is important because, to the extent dual use of the marks presents a likelihood of confusion, the Deli must establish prior usage.  Otherwise, HAG's registration of its Heart Attack Grill mark with the USPTO confers exclusive nationwide rights for its mark to the exclusion of marks that present a likelihood of confusion.  *See Dawn Donut Co. v. Hart's Food Stores Inc.*, 267 F.2d 358, 362 (2d Cir. 1959); 4A Callmann on Unfair Comp., Tr. & Mono. § 26:4 (4th ed. 2012); *Carl Karcher Enter. Inc. v. Stars Rests. Corp.*, 35 U.S.P.Q.2d 1125, 1133 (1995) ("15 U.S.C. § 1057(b)[] creates a presumption that the registrant has the exclusive right to use its mark throughout the United States."); *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1568 (Fed. Cir. 1983) (same).  The parties disagree whether the Deli has established that it used the Instant Heart Attack Sandwich mark before June 9, 2005.

The Deli's evidence of prior usage consists of:  (1) Jack Lebewohl's sworn declaration that he created the sandwich "around 2004," Lebewohl Decl. ¶ 6; (2) a menu dated "2004-05" that contains both the name of the sandwich and an address for a Deli location that closed on January 1, 2006 (Dkt. 68 Ex. 9); (3) the May 19, 2004, Chowhound review (Dkt. 57 Ex. 12); (4) the January 13, 2005, Chowhound message-board post (Dkt. 65 Ex. 4); and (5) the July 2004 Korean Airlines newsletter (Dkt. 65 Ex. 3.)  HAG disputes the admissibility of the latter three items, because the Deli's counsel merely downloaded them from the Internet with no authentication from a business-records custodian (*i.e.*, from Chowhound or Korean Airlines).

HAG is correct that this side issue over authentication could have been mooted had the Deli obtained affidavits from custodians at Chowhound and Korean Airlines that the exhibits in

question were authentic records of those entities.  HAG is also correct that the Rules of Evidence

apply on a motion for summary judgment.  *See Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir.

1997).  However, notwithstanding the Deli's regrettably casual approach to authentication, the

Court's judgment is the Chowhound and Korea Airline records are sufficiently authenticated to

be admitted here.

      A district court has broad discretion over the admissibility of evidence.  *See Raskin*, 125

F.3d at 65–66.  The test for authentication under Federal Rule of Evidence 901 is, simply,

whether a reasonable juror could find the proffered evidence authentic.  *See* Fed. R. Evid. 901(a)

("The requirement of authentication . . . is satisfied by evidence sufficient to support a finding

that the matter in question is what is proponent claims."); *United States v. Tin Yat Chin*, 371 F.3d

31, 38 (2d Cir. 2004).  Under Rule 901(a), "[t]he bar for authentication of evidence is not

particularly high."  *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007) (citing *United

States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001)).  The proponent need not "rule out all

possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is

what it purports to be."  *Gagliardi*, 506 F.3d at 151 (citing *United States v. Pluta*, 176 F.3d 43,

49 (2d Cir. 1999)).  Rather, a document may be authenticated based on its "appearance, contents,

substance, internal patterns, or other distinctive characteristics, taken in conjunction with

circumstances," Fed. R. Evid. 901(b)(4), and circumstantial evidence may establish authenticity.

*See United States v. Bagaric*, 706 F.2d 42, 67 (2d Cir. 1983), *abrogated in part on other grounds

by Nat'l Org. for Women Inc. v. Scheidler*, 510 U.S. 249 (1994); *United States v. Holmquist*, 36

F.3d 154, 167 (1st Cir. 1994); *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423 (10th

Cir. 1991); *John Paul Mitchell Sys. v. Quality King Distribs. Inc.*, 106 F. Supp. 2d 462, 472

(S.D.N.Y. 2000).  Such evidence can include a document's appearance and content.  *See John*

*Paul Mitchell*, 106 F. Supp. 2d at 472; *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 556 (D. Md. 2007).  Newspaper and periodical evidence, furthermore, may be self-authenticating.  *See* Fed. R. Evid. 902(6).

Here, the Deli's counsel, William Chuang, has represented that he downloaded the Chowhound and Korean Airlines exhibits from the Internet websites of those entities.  Chuang Decl. ¶¶ 2–8; Deli Reply 3.  Given that representation, a recent decision by a federal district court in Michigan in a Lanham Act case is apposite.  In *Foreword Magazine, Inc. v. OverDrive Inc.*, No. 10-cv-1144, 2011 WL 5169384, at *4 (W.D. Mich. Oct. 31, 2011), various Internet printouts were submitted to show use in commerce at summary judgment on a Lanham Act claim.  The Court noted that "[t]he Federal Rules of Evidence, including Rule 901, apply to computer-based evidence in the same way as they do to other evidence."  *Id.* at *3 (citing 5 Weinstein's Federal Evidence § 900.05(1)(b) at 900–50 (2d ed. 2004)).  It admitted numerous screenshots from websites, accompanied only by the sworn affidavit of an attorney.  The Court noted that the affidavit, "along with other indicia of reliability (such as the Internet domain address and the date of printout)[,] are sufficient to authenticate these exhibits . . . ."  *Id.* at *3.  It recognized that where a litigant offers a printout from a third party website not to show the truth of the matter asserted, but "merely to show that certain images and text appeared on the website, they are not statements at all and thus fall outside the ambit of the hearsay rule."  *Foreword Magazine*, 2011 WL 5169384, at *4; *see also Firehouse Rest. Grp. Inc. v. Scurmont LLC*, No. 09-cv-00618, 2011 WL 3555704, at *5 (D.S.C. Aug. 11, 2011); *Perfect 10 Inc. v. Cybernet Ventures Inc.*, 213 F. Supp. 2d 1146, 1155 (C.D. Cal. 2002); *accord United States v. Cameron*, 762 F. Supp. 2d 152, 157–58 (D. Me. 2011).

The same logic dictates a finding of admissibility here.  The Chowhound and Korea

Airlines exhibits were submitted as attachments to a declaration by the Deli's attorney.  (Dkt.

64.)  Each has sufficient indicia of authenticity.  Like the printouts admitted in *Foreword*

*Magazine*, the July 2004 Korean Airlines article contains an Internet domain address as well as a

printout date.  (Dkt. 68 Ex. 2.)  It appears to contain the text of the original Korean Airlines

newsletter reprinted on the author's professional website.  The address for the Deli given in the

article is the Deli's location as of July 2004.[6]

As for the two Chowhound posts, they are direct printouts from the Chowhound.com

website; both contain Internet domain addresses as well as printout dates.  Both articles remain

accessible on that public website as of the writing of this opinion, as the Court has verified.  *See*

Dkt. 68 Exs. 1, 3; (http://chowhound.chow.com/topics/217845, *last visited* July 5, 2012);

(http://chowhound.chow.com/topics/210489, *last visited* July 5, 2012).  Both reviews contain

indicia of reliability.  A detailed analysis of the food at the Deli in the May 19, 2004 review

describes a sandwich referred to as the "No. 4," in words that match the description of the same

sandwich on the Deli's 2004-05 menu.  (Dkt. 68 Exs. 1, 9.)  The description of the Instant Heart

Attack Sandwich itself in the January 13, 2005 message board post similarly matches the

description on the Deli's 2004-05 menu.  (Dkt. 68 Exs. 3, 9.)  The reviewer described the

sandwich as containing "two huge potato pancakes (instead of bread slices) with your choice of

pastrami, corned beef, etc." *Id.*  That post also correctly identified the Deli's then-location.  *Id.*

For all these reasons—and because the Korean Airlines and Chowhound exhibits are

consistent with the Deli's 2004-05 menu and with Jack Lebewohl's sworn declaration—they

---

[6] According to Lebewohl's declaration, the old restaurant was located at 156 Second Avenue in
the Lower East Side of Manhattan.  Lebewohl Decl. ¶ 2.

satisfy Rule 901(b)(4)'s requirements for authentication.[7]  Viewed together, and in conjunction

with the 2004-05 menu and with Jack Lebewohl's declaration, this evidence demonstrates—

convincingly—that the Deli's Instant Heart Attack Sandwich mark was in use before HAG filed

to register its Heart Attack Grill mark.

　　　The Deli has thus demonstrated senior use of its mark, a predicate for a concurrent use

arrangement.  *See* 15 U.S.C. § 1052(d); *Enterprise Rent-A-Car Co. v. Advantage Rent-A-Car

Inc.*, 330 F.3d 1333, 1339 (Fed. Cir. 2003).  Concurrent use registrations can be obtained in

concurrent use proceedings before the USPTO, 37 C.F.R. § 2.99, or by order of the district court

in a civil action.  *See* 15 U.S.C. § 1119; *Enterprise*, 330 F.3d at 1339; *cf. Application of Beatrice

Foods Co.*, 429 F.2d 466, 474 (C.C.P.A. 1970).  In deciding whether to approve a concurrent use

arrangement, courts commonly set parameters (often taking the form of geographic or mode

restrictions) designed to balance the interests of the senior user and the senior registrant, mindful

that the senior user has no entitlement to use its mark beyond the area or mode in which it was

used before its adversary's registration.  *See Beatrice Foods*, 429 F.2d at 474; 1 James E. Hawes

& Amanda V. Dwight, *Trademark Registration Practice* § 11:2 (2d ed. 2008) ("A court has far

broader authority [than the USPTO] to determine the priority of concurrent use of marks and

conditions for their federal registration."); *see also Holiday Inn v. Holiday Inns*, Inc., 534 F.2d

---

[7] The cases on which HAG relies, involving the exclusion of newspaper articles for the truth of
the matter asserted, are not to the contrary.  *See, e.g.*, *Cantave v. New York City Police Officers*,
No. 09-cv-2226, 2011 WL 1239895, at *11 n.6 (E.D.N.Y. Mar. 28, 2011).  On the contrary, the
Second Circuit has upheld the use of newspaper articles and travel guides as proof of prior use.
*See Patsy's*, 658 F.3d at 268; *see also Demetriades*, 698 F. Supp. at 524 (using newspaper
evidence to establish use in commerce); *Int'l Healthcare Exch.*, 470 F. Supp. 2d at 371
(suggesting publicity in brochures, catalogs, or newspapers can establish prior use in commerce).

312 (C.C.P.A. 1976) (holding that the USPTO had properly limited a national chain's marks to a particular geographic area on the basis of a district court's judgment to that effect).[8]

For several reasons, the Court, in exercising its discretion, declines to award the Deli the broad permission it seeks in its summary judgment request for exclusive use of its mark in the tri-state area (New York, New Jersey, and Connecticut). First, HAG, as the senior registrant, has presumptive nationwide rights to use its mark. Judicially permitted use, if any, for the Deli of its Instant Heart Attack Sandwich mark outside the geographic parameters of the Deli's demonstrated prior use of that mark would at most be concurrent with, and not exclusive of, the use by HAG, as the senior registrant, of its mark in those new geographic areas. Thus, any request by the Deli for exclusive rights outside the specific geographic area in which it has demonstrated prior use of its mark is, as a matter of law, not merited.

Second, to the extent the Deli is properly read to seek authorization to use its mark in the tri-state area concurrently with HAG's right to use its senior mark there, there is no need whatsoever at this time to resolve the question whether such use would, or would not, conflict with HAG's senior mark. By its own admission, the Deli has no current plans to expand outside

---

[8] The limitations most commonly applied in concurrent use orders restrict usage on a geographic basis. *See The Tamarkin Co. v. Seaway Food Town Inc.*, 34 U.S.P.Q.2d 1587, 1589 n.4 (Trademark Tr. & App. Bd. 1995). "If likelihood of confusion would result if the applicant's mark and the prior mark are used in the same territories, but the likelihood of confusion can be eliminated if the parties' respective territories of use are restricted to avoid overlap, then a concurrent registration which incorporates those geographic restrictions may be issued." *See, e.g., Houlihan v. Parliament Import Co.*, 921 F.2d 1258 (Fed. Cir. 1990); *Beatrice Foods*, 429 F.2d at 466; *Precision Tune Inc. v. Precision Auto-Tune Inc.*, 4 U.S.P.Q.2d 1095 (Trademark Tr. & App. Bd. 1987). Mode limitations address the "manner of displaying the mark, *e.g.*, where the mark is displayed only in a certain stylization, or only in conjunction with a particular trade dress or house mark, or only in conjunction with a disclaimer of affiliation." *The Tamarkin Co.*, 34 U.S.P.Q.2d at 1589 n.4; 4A Callman on Unfair Comp., Tr. & Mono. § 26:23 (4th ed. 2012).

Manhattan, let alone to the tri-state area.  Notably, the instant litigation came about not because of an expansion plan by the Deli into those areas.  Instead, it arose because HAG sent an aggressive cease-and-desist letter, attempting to curtail any usage by the Deli of its mark, which in turn prompted the Deli to file its lawsuit.  Absent an actual case or controversy, the Court declines to rule on the Deli's claim that its sandwich could permissibly be served throughout the tri-state area without giving rise to confusion with HAG's mark.  The record before the Court is simply inadequate to resolve whether concurrent use of the competing marks in geographic areas which neither party has entered or has a present plan to enter (whether the tri-state area or other parts of the country) would create a likelihood of confusion.

To be sure, on the record before the Court, there is a very substantial argument that HAG's Heart Attack Grill mark and the Deli's Instant Heart Attack Sandwich mark could coexist in the same geographic area without giving rise to significant (or any) confusion:  One mark describes a medically themed restaurant; and the other describes a particular sandwich served by a kosher deli bearing an entirely different name.  In the Court's view, there is very good reason to believe that consumers could differentiate between the two marks.  Indeed, HAG's position is that, were it to open a branch in Manhattan next door to the Deli, there would not be a likelihood of confusion presented between its theme restaurant and the Deli's sandwich.  *See* Tr. 37. However, on the record at hand, there is simply insufficient data, including a complete lack of studies as to the likelihood of actual confusion in any potential expansion venue, to permit the Court to reliably resolve that issue.  Any assumption by the Court as to consumer confusion would be unacceptably conjectural.

The parties, however, agreed at argument that a narrower concurrent use order can be entered as follows.  This order, in the Court's view, is amply sufficient to address the parties' actual business needs at this time.

*Geographic terms*:  The parties agree that the Deli may continue to serve the Instant Heart Attack Sandwich anywhere in Manhattan, *i.e.*, not just at its two present restaurants but at other Manhattan locations, and that doing so does not give rise to a likelihood of confusion.  This arrangement reasonably reflects that the Deli has operated continuously, and exclusively, at various locations in Manhattan, for the past 60 years.  In so ruling, the Court does not resolve whether the Deli may offer its sandwich outside of Manhattan without giving rise to consumer confusion; nor does the Court address whether customer confusion would ensue were HAG one day to expand into the Deli's demonstrated areas of prior usage within Manhattan, so as potentially to justify excluding HAG from operating within the geographic area of the Deli's prior use.  As noted, the Court is quite skeptical that any meaningful confusion between HAG's restaurant and the Deli's sandwich would ensue.  However, those issues are properly left for either the USPTO, or a court, to resolve upon a full record and in the context of a concrete controversy.

*Advertising and signage*:  The parties also agree that the Deli may continue to advertise the Instant Heart Attack Sandwich on its in-restaurant menus.  HAG would, however, bar the Deli from advertising the sandwich on the menus reproduced on the Internet or on its interior and exterior signs.  HAG's basis for taking this position is that there is no evidence that the Deli engaged in Internet advertising or signage as of June 9, 2005.  Although factually that is correct, in the Court's judgment these modest additional forms of promotion of the Instant Heart Attack Sandwich do not present any material risk of customer confusion.  Accordingly, the Court's

concurrent use order will also permit the Deli (1) to advertise the Instant Heart Attack Sandwich on interior and exterior signs at its Manhattan restaurants, and (2) to reproduce in its Internet advertising the menu used in its Manhattan restaurants.

### 2.   Triple Bypass Sandwich Mark

The Court next addresses the second sandwich at issue, the Triple Bypass Sandwich, which the Deli proposes to offer.[9]   As to that product, the Deli originally sought a judgment that there could be no likelihood of confusion between its mark and HAG's Triple Bypass Burger mark.  At oral argument, however, when pressed by the Court, the parties largely agreed to an arrangement of rights as to those two marks that the Court believes will not lead to marketplace confusion.

The parties agree that HAG used, filed for and registered the Triple Bypass Burger mark—and its other Bypass Burger marks[10]—before the Deli ever conceived of the Triple Bypass Sandwich mark.  The Deli, in fact, has yet to use the mark.  On December 27, 2005, HAG filed for the right to use its Triple Bypass Burger mark.  On December 5, 2006, that mark was registered.  On September 29, 2010, almost four years later, the Deli filed its intent-to-use

---

[9] The Court finds, for the same reasons given with respect to the Instant Heart Attack Sandwich, that it has jurisdiction to address the Deli's claims with regard to the Triple Bypass Sandwich. Lanham Act jurisdiction can exist, even before a product enters the market.  *See PDK Labs, Inc. v. Proactive Labs Inc.*, 325 F. Supp. 2d 176, 180 (E.D.N.Y. 2004) ("[C]ourts have found that trademark infringement litigation may proceed even in the absence of the product having been sold."); *see also Maritz Inc. v. Cybergold Inc.*, 947 F. Supp. 1328, 1335 (E.D. Mo. 1996) (Lanham Act infringement action not premature when defendant's web site sent out information regarding allegedly infringing product, even though product itself was not yet operational); *Essie Cosmetics Ltd. v. Dae Do Int'l Ltd.*, 808 F. Supp. 952, 957 (E.D.N.Y. 1992) ("In a trademark infringement action, a court may grant injunctive relief 'even before defendant actually opens the business,' so long as the threatened act of defendant is 'imminent and impending.'") (quoting J. Thomas McCarthy, *Trademarks and Unfair Competition*, § 30.5 at 470 (2d ed. 1984)).

[10] As noted, in 2005, HAG registered marks for the Single Bypass Burger, the Double Bypass Burger, and the Quadruple Bypass Burger.  (Dkt. 27 Ex. A.)

application[11] for the Triple Bypass Sandwich mark.  On January 13, 2011, the USPTO, in a non-final Office Action, initially rejected the Deli's application.  (Dkt. 65 Ex. F.)  To the extent a likelihood of confusion exists, HAG, therefore, would have the right, as the senior registrant with no demonstrated prior use by its adversary, to exclusive use of the Triple Bypass Burger mark.  And, because HAG's Triple Bypass Burger mark and the Deli's Triple Bypass Sandwich mark both describe products, a full judicial inquiry into confusion would present a somewhat greater likelihood of a finding of confusion than that presented by the Heart Attack Grill and Instant Heart Attack Sandwich marks.

At oral argument, however, HAG—in a commendable effort to resolve the present dispute—invited a limited ruling against itself.  It urged the Court to find no likelihood of confusion between the Triple Bypass Sandwich and the Triple Bypass Burger under a discrete set of conditions.  Specifically, HAG's attorney conceded that "[t]here is no likelihood of confusion regarding [the Triple Bypass Sandwich] as long as the Triple Bypass Sandwich is only shown on a menu, only sold in the current restaurant[s], and there is no signage, interior or exterior."  Tr. 21.  HAG also consented to use of the Triple Bypass Sandwich on the Deli's website, but only insofar as the Triple Bypass Sandwich is shown on an online menu.  *Id.* at 22.  The Deli's

---

[11] Section 1051(b) of the Lanham Act permits an applicant who claims a bona fide intent to use a mark to file an application for registration on the Principal Register.  If the mark appears registrable, the USPTO publishes it for opposition.  15 U.S.C. § 1062(a).  If no opposer is successful, the USPTO issues a notice of allowance.  *Id.* § 1063(b)(2).  The applicant then has six months to file a statement that "verifies that the mark is in use in commerce, the date of first use in commerce, the goods and services in connection with the mark are used in commerce, and the manner in which the mark is being used."  *Eastman Kodak Co. v. Bell & Howell Doc. Mgmt. Prods. Co.*, 994 F.2d 1569, 1570 (Fed. Cir. 1993) (citing § 1051(d)(1)).  That statement is then subject to another examination where the USPTO considers how the mark is used and, "if it is still satisfied that, as used, the mark is registrable, issues a certificate of registration."  *Eastman Kodak*, 994 F.2d at 1570.

attorney, accompanied at argument by the two Lebewohl defendants, accepted the offer, agreeing that under those conditions there could be no likelihood of confusion. *Id.* at 23.

The Court has an independent duty to assess whether there is a likelihood of confusion, and if it so found, the Deli would be unable to register or use its Triple Bypass Sandwich mark, notwithstanding HAG's consent. *See Application of Cont'l Baking Co.*, 390 F.2d 747, 749 (C.C.P.A. 1968) (finding that a mark owner's consent to allow another party to register the exact same mark cannot conclude a likelihood of confusion analysis, because it "would be to allow individuals to take the law in their own hands, thus usurping the responsibility that Congress has placed in the [USPTO]"). However, agreements by the parties can be persuasive evidence that a certain arrangement will not lead to a likelihood of confusion. *See Beatrice Foods*, 429 F.2d at 474 ("[W]e see no reason why agreements such as that worked out by the parties here should not be considered. Unquestionably, such stipulations are never binding on the board. Nevertheless, if it can be determined that they are in good faith, there can be no better assurance of the absence of any likelihood of confusion, mistake or deception than the parties' promises to avoid any activity which might lead to such likelihood.").

Here, the Court is persuaded that the arrangement proposed by the parties, which the Court encouraged at argument, is a fair one that is unlikely to lead to confusion. The Court therefore authorizes a concurrent use scheme, under which the Deli may use its Triple Bypass Sandwich mark at its current restaurants, but only on its hard-copy as well as its online menu. The Deli may not use any images of the sandwich on either menu. No signage on either the interior or exterior of the restaurants may reference the Triple Bypass Sandwich mark. This concurrent use arrangement does not in any way limit HAG's rights as to its own expansion or menu offerings.

The Court recognizes that the arrangement agreed to by the parties as to the Triple Bypass Sandwich differs somewhat from the outcome as to the Instant Heart Attack Sandwich. That is because the facts are different—including that the Deli had rights with respect to the Instant Heart Attack Sandwich flowing from its prior use, which it does not have in connection with the Triple Bypass Sandwich; and that the Triple Bypass products present a somewhat greater risk of confusion. The parties' agreement fairly takes into account those differences. The agreement reached by the parties at argument with respect to the Triple Bypass Sandwich was concrete; the Court is not inclined to tinker with it or rewrite it.

### B.  HAG's Counterclaims

After the Deli filed its lawsuit, HAG brought a number of counterclaims, three of which survive. The remaining claims seek a ruling that: (1) the Deli cannot register its marks; (2) the Deli may not expand its use of the marks; or alternatively, (3) the parties may concurrently use, under an arrangement to be determined by the Court, the marks Instant Heart Attack Sandwich and Heart Attack Grill.

HAG has now moved for voluntary dismissal of its counterclaims under Fed R. Civ. P. 41(a)(2). A trial court has great discretion in considering whether to grant a motion for voluntary dismissal under the rule. *See D'Alto v. Dahon California Inc.*, 100 F.3d 281, 283 (2d Cir. 1996) ("Rule 41(a)(2) dismissals are at the district court's discretion and only will be reviewed for an abuse of that discretion."); *Zagano v. Fordham Univ.*, 900 F.2d 12, 14 (2d Cir. 1990), *cert. denied*, 498 U.S. 899 (1990); *Allen v. Indeck Corinth L.P.*, 161 F.R.D. 233, 235 (N.D.N.Y. 1995); *Guzman v. Hazemag U.S.A. Inc.*, 145 F.R.D. 308, 309 (E.D.N.Y. 1993). The Second Circuit has articulated "five factors that must be weighed by the district courts in deciding whether to grant a Rule 41(a)(2) motion for voluntary dismissal." *Pizzulli v. Nw. Mut. Life Ins.*

*Co.*, No. 05-cv-1889, 2006 WL 490097, at *1–2 (S.D.N.Y. Feb. 28, 2006).  Referred to as the

*Zagano* factors, they are as follows:

> [T]he plaintiff's diligence in bringing the motion; any undue vexatiousness on plaintiff's part; the extent to which the suit has progressed, including the defendant's effort and expense in preparation for trial; the duplicative expense of relitigation; and the adequacy of plaintiff's explanation for the need to dismiss.

*Zagano*, 900 F.2d at 14.

HAG has already sought voluntary dismissal of its claims once, as part of a bid for

dismissal of the overall case for lack of jurisdiction.  The Court granted that motion as to HAG's

dilution counterclaim, but denied it without prejudice with respect to the other counterclaims,

because the Court preferred to assess those claims after discovery, then ongoing, was complete.

*See* Dkt. 41.  The Court's concerns at that time no longer apply, now that discovery has

concluded.   And the *Zagano* factors favor dismissal.  First, HAG's diligence in bringing this

motion is beyond dispute; it has already sought voluntary dismissal.  Second, HAG was not

unduly vexatious during this litigation.  Third, the suit has progressed to summary judgment, but

the Deli is not prejudiced in any way by the termination of the claims against it because of the

attendant declaratory judgment in its favor.  Fourth, there is unlikely to be further litigation given

the parties' agreements—and the Court's corresponding orders.  Finally, as a practical matter, the

Court's resolution of the parties' disputes as to both sets of marks respond to the concerns

animating HAG's counterclaims.  The Court therefore will grant HAG's unopposed motion to

dismiss its counterclaims.

### C.    Fees

Both parties to this litigation originally requested attorneys' fees.  15 U.S.C. § 1117(a)

provides that "[t]he court in exceptional cases may award reasonable attorney[s'] fees to the

prevailing party."  To be entitled to attorneys' fees, the party must be the "prevailing party" and,

further, the case must be "exceptional," or, in other words, involve fraud, bad faith, or willful infringement. *See Patsy's Brand Inc. v. I.O.B. Realty Inc.* ("*Patsy's Brand III*"), 317 F.3d 209, 221 (2d Cir. 2003). Even then the statute provides only that the district court "may" award attorneys' fees. *See* 15 U.S.C. § 1117(a).

Here, neither party has met the statutory standard for the award of fees, as there have been no allegations of bad faith or willful infringement. The Court therefore denies both motions.

### D.    Future Disputes

The Court notes that the parties (both modest-sized businesses and their principals) have spent many months (and presumably a great deal of money in legal fees and costs) litigating this dispute, only to agree at argument on terms that could readily have been arrived at long ago and which do not seem to impinge either's practical interests in the slightest. The Court's order today substantially embodies those agreements. In the event that future quarrels arise, the Court strongly encourages the parties to eschew provocative cease-and-desist letters or precipitous lawsuits, and instead to work together to try to resolve their differences cooperatively.

### CONCLUSION

As to the Instant Heart Attack Sandwich mark: The Deli's motion for summary judgment on its claim for a declaratory judgment that its current use of that mark does not infringe HAG's Heart Attack Grill mark is granted. In the exercise of its equitable authority, the Court also enters a concurrent use order permitting the Deli to use the Instant Heart Attack Sandwich mark at current or future restaurants within Manhattan; to advertise the Instant Heart Attack Sandwich on interior and exterior signs at its Manhattan restaurants; to use that mark on its in-person menus in Manhattan; and to reproduce in its Internet advertising the menu used in its Manhattan

restaurants. The Court denies the Deli's motion for a declaratory judgment that it may use the Instant Heart Attack Sandwich mark outside of Manhattan, including throughout the tri-state area (New York, New Jersey, and Connecticut) and that it may use that mark to the exclusion of HAG's mark.

As to the Triple Bypass Sandwich mark: The Deli's motion for a declaratory judgment that it may use that mark pursuant to a concurrent use order is granted. Under that order, the Deli may use its Triple Bypass Sandwich mark at its current restaurants, but only on its hard-copy menu and its online menu. The Deli may not use any images of the sandwich on either menu, or reference the Triple Bypass Sandwich mark on signage on either the interior or exterior of its restaurants.

HAG's motion to voluntarily dismiss its counterclaims against Plaintiff is granted. Both parties' requests for attorneys' fees are denied.

The Clerk of the Court is directed to terminate the motions at docket entry numbers 53 and 62, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 6, 2012
    New York, New York